IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WILLIAM PERSON,<br><br>                Plaintiff,<br><br>v.<br><br>HORIZON HEALTH CORPORATION, KIDS BEHAVIORAL HEALTH OF UTAH, INC., dba COPPER HILLS YOUTH CENTER,<br><br>                Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:09-cv-00395 CW<br><br>District Judge Clark Waddoups |

After being terminated from Defendants' employment, William Person ("Person") filed suit, alleging 1) retaliation for taking medical leave under the Family Medical Leave Act ("FMLA"), 2) interference with his rights under the FMLA, and 3) wrongful discharge in violation of public policy. Defendants have responded with a Motion for Summary Judgment, claiming Person was fired because of a pattern of poor work performance. For the reasons discussed below, the court determines that there are genuine issues of material fact for both Person's FMLA claims, but that Person's wrongful discharge claim fails as a matter of law. Therefore, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

## FACTS

Defendants operated Copper Hills Youth Center ("Youth Center"), a residential treatment facility for teenagers with behavioral issues.  Incoming youth were assigned to various units after an initial evaluation; according to Youth Center policy, general conduct disorder patients were to be separated from sexual misconduct patients, and residents were also separated by sex.  In order to comply with state licensing requirements, Youth Center was required to maintain a staff-to-youth ratio of at least one-to-four.

Person was hired as a Mental Health Associate in May 2005, and was promoted to Program Lead for the Boys A unit in April 2006.[1]  As Program Lead, Person was to continue to provide direct care for residents, while overseeing the unit and assuming responsibility for the unit's staff.  Person's direct supervisor was Signe Evans ("Evans"), Youth Center's Chief Operating Officer, who was responsible for his promotion.

Throughout his time as Program Lead, Person repeatedly complained, often in writing, about under-staffing.  These complaints were not made with reference to the state mandated staff-to-resident ratio, but were general comments about his unit being short-staffed.  *See* Plaintiff William Person's Memorandum in Opposition to the Defendants' Motion for Summary Judgment ("Memo. in Opp.") (Dkt 38), Exhibit I, *W. Person, Committee of Whole Reports*. Additionally, Person informed Evans of what he believed were inappropriate resident placements on his unit.  Plaintiff claims that, on at least one occasion, a sexual misconduct patient was

---

[1] This employment was at-will under Utah law.  *See Hansen v. Am. Online, Inc.*, 96 P.3d 950, 952 (Utah 2004) (stating all employment relationships "entered into for an indefinite period of time" are presumably at-will and may be terminated by either party at any time for almost any reason).

placed in his unit instead of in the unit designated for such residents, and also contended that Defendants were accepting residents who were too psychologically disturbed for the facility.

On March 28, 2007, Evans conducted a performance appraisal of Person. The appraisal states Person had "done an excellent job bringing an ineffective unit to a functioning unit," that he was "very effective" at crisis management, and that he had "done well despite being short staffed." Memo. in Opp., Exhibit G, *Kids Behavior Health, Performance Appraisal*.

Defendants claim that during spring and summer of 2007, Evans repeatedly met with Person to discuss his job performance, telling Person he needed to provide more structure on his unit for residents and discipline his staff when they arrived late for work. Defendants have produced an email, dated April 10, 2007, which supports their claims that there were ongoing issues in Person's unit. Memo. in Opp., Exhibit H, *S. Evans, email to W. Person*. Although Person states Defendants' email system normally included a date at the top, this email message is dated at the bottom, in a font different from the body of the email, and the document was not placed in Person's file until he was terminated. Person argues the email was fabricated months after its purported date to lend support to Defendants' claim that he was terminated for poor performance. Person also claims that meetings with Evans only occurred when he approached her to voice his concerns about under-staffing and resident placements.

In September 2007, Person submitted a request under the FMLA for leave to obtain a needed knee surgery. The request was approved and he began leave on September 28, 2007. Evans, claiming that the unit was running more smoothly in Person's absence, decided to terminate him. She prepared a document dated October 3, 2007, which discusses several issues with Person's performance including his unwillingness to implement her feedback, poor

management of his staff members, and his refusal to take responsibility for the unit's problems by blaming all issues on under-staffing and claiming he was working far more hours than he actually was. Memo. in Opp., Exhibit K, *S. Evans, typewritten notes*. The document, however, refers to events which did not happen until October 6, 2007, leading Person to argue it was prepared later and backdated to give support to Evan's decision to terminate Person.

On October 6, 2007, Person returned to the unit. He states he was called in because of a riot, while the document Evans prepared states the riot occurred because of Person's presence. Person called a code and assisted in physically controlling the situation.

Although Evans states she had decided to terminate Person by October 3, Person was not informed he was being terminated until October 16, 2007, when he was called in to a meeting with Evans and Youth Center's Human Resources Director, Barbara Pool. After Person's termination, it is unclear who replaced him as team lead of the Boys A unit. Defendants state Joe Sanchez replaced Person, while Person claims Ricky Scoggan became the new team lead. Scoggan has stated that in the year following Person's termination, drastic under-staffing and inappropriate resident placements continued to plague the unit, and Evans did nothing in response to Scoggan's complaints about the situation. Memo in Opp., Exhibit N, *Declaration of Ricky Ryan Scoggan*.

Person has now filed this lawsuit, claiming that his termination constituted retaliation against and interference with the exercise of his rights under the FMLA, in violation of 29 U.S.C. § 2615. Person also argues that he was retaliated against for his complaints about staffing and resident placement, which implicate significant public policy concerns, and that his termination therefore constituted wrongful discharge under Utah state law.

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003). A fact is "material" if it is "essential to the proper disposition of the claim." *Id.* The court views the evidence in the light most favorable to the non-moving party, as "evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in the [nonmovant's favor]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**ANALYSIS**

**I.    FMLA RETALIATION**

Under 29 U.S.C. § 2615(a)(2), it is unlawful for employers to discriminate against individuals for exercising their rights under the FMLA. Because Plaintiff lacks direct evidence of retaliation under the FMLA, his claim is properly analyzed under the burden shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 04 (1973).

Under this analysis, the Plaintiff must first state a prima facie case of retaliation, showing "(1) [he] engaged in a protected activity; (2) [Defendants] took an action that a reasonable employee would have found materially adverse; [and] (3) there exists a causal connection between the protected activity and the adverse action." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (citation omitted). It is undisputed that Person took FMLA leave, and that Defendants terminated his employment.

The causal connection between the two events can be established by temporal proximity alone when "the termination is *very closely* connected in time to the protected activity." *Id.* at 1171 (quotation and citation omitted) (emphasis in the original). The Tenth Circuit has held that a period of six weeks, standing alone, is sufficiently close in time to infer a causal connection. *Id.* at 1171 72. Taking facts in the light most favorable to the plaintiff, Defendants decided to terminate him five days after he began his leave. This very short period of time is sufficient to establish temporal proximity; thus, Person has stated a prima facie case of retaliation under the FMLA.

Once the prima facie case is established, the defendant must show a legitimate, non-retaliatory reason for Person's termination. Defendants have done so, citing Person's poor management skills and unwillingness to implement constructive feedback.

When the defendant identifies lawful grounds for the termination decision, the burden shifts back to the plaintiff to show these claimed reasons are merely pretextual. Pretext "may be based on weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." *Turner v. Publ Serv. Co. of Colo.*, 563 F.3d 1136, 1143 (10th Cir. 2009). Temporal proximity is relevant, but cannot show pretext without other evidence. *Metzler*, 464 F.3d at 1172.

Other circumstantial evidence can be found in this case. Person was never warned of possible termination, and his final performance evaluation was positive, even though Defendants allege that issues had arisen with his management of the unit by this time. Evans claimed the unit ran more smoothly in Person's absence, but a riot broke out within the second week of

Person's leave which he had to help subdue. Furthermore, documents prepared in anticipation of litigation raise an inference of pretext, particularly when the timing of the documents is suspicious. *Id.* at 1177. Material questions of fact remain as to whether or not various documents prepared by Evans were written near the time of Person's termination and back-dated to give support to Defendants' action. Because disputed questions of fact bear heavily on whether Person can show pretext, the court will not grant summary judgment on his claim of retaliation under the FMLA.

## II.     FMLA INTERFERENCE

It is also unlawful for any employer to interfere with the exercise of rights under the FMLA. 29 U.S.C. § 2615(a)(1). In order to establish a prima facie case of interference, the plaintiff must show "(1) that he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." *Jones v. Denver Pub. Schs.*, 427 F.3d 1315, 1319 (10th Cir. 2005). Interference is actionable regardless of an employer's intent. *See Bones v. Honeywell Int'l*, 366 F.3d 869, 877 (10th Cir. 2004). The FMLA "'is nevertheless not a strict liability statute,' and an employer is not necessarily liable under the FMLA anytime it fires an employee who has requested or is on FMLA leave." *Twigg v. Hawker Beechcraft Co.*, 659 F.3d 987, 1006 (10th Cir. 2011) (quoting *Metzler*, 464 F.3d at 1180). Rather, the employer can escape liability if it can show that the employee would have been terminated even if he had not taken FMLA leave. *Metzler*, 464 F.3d at 1180.

Defendants do not dispute that Person had a right to FMLA leave for his surgery, and that he was terminated while on leave. As in a retaliation claim, a relation between the termination

and the leave can be established by temporal proximity. Evans decided to terminate Person mere days after he began his leave, suggesting the two events were related.

Thus, Defendants must show Person would have been terminated even if he had not taken leave. Here, there is no evidence that termination was contemplated prior to Person's surgery. Furthermore, as explained above, material questions of fact remain as to when several documents important to Defendants' theory of the case were prepared. Therefore, summary judgment on Person's claim of FMLA interference is inappropriate at this time.

### III. WRONGFUL DISCHARGE CLAIM

In an at-will employment relationship, an employer may generally terminate an employee "for any reason (or no reason)." *Hansen v. Am. Online*, 96 P.3d 950, 952 (Utah 2004). However, even an at-will employee has an action in tort when he can show he was wrongfully discharged, and "the termination of employment constitute[d] a violation of a clear and substantial public policy." *Fox v. MCI Commc'ns*, 931 P.2d 857, 859 (Utah 1997).

"To make out a prima facie case of wrongful discharge, an employee must show (i) that his employer terminated him; (ii) that a clear and substantial public policy existed; (iii) that the employee's conduct brought the policy into play; and (iv) that the discharge and the conduct bringing the policy into play are causally connected." *Ryan v. Dan's Food Stores*, 972 P.2d 395, 408 (Utah 1998). Once the plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate reason for the discharge. If the employer can do so, the employee must then prove "engaging in the protected conduct was a 'substantial factor' in the employer's motivation to discharge the employee." *Id.* at 409 10. It is undisputed that Person was terminated. Therefore, the court must determine whether Person brought into play a "clear and

substantial" public policy, and, if so, it must look to the causal connection between this public policy and his termination.

In the wrongful termination context, public policies are construed narrowly. *Id.* at 405. This is a relatively new area of state law, and "determining what employee conduct implicates or furthers a clear and substantial public policy is a still developing inquiry." *Id.* at 408 (quoted in *Touchard v. La-Z-Boy, Inc.*, 148 P.3d 945, 950 (Utah 2006)). The Utah Supreme Court has stated, however, that "[w]hen making determinations of public policy for purposes of the exception to the at-will rule, we will construe public policies narrowly, applying only those principles which are so substantial and fundamental that there can be virtually no question as to their importance for the promotion of the public good." *Touchard*, 148 P.3d at 950 (internal quotations, citations, and alterations omitted).

To sustain an action for wrongful termination, the policy must be both clear and substantial. *Id.* "A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions." *Ryan* 972 P.2d at 405. In order to be substantial, the policy must further public, rather than private, interests. *Retherford v. AT&T*, 844 P.2d 949, 966 n.9 (Utah 1992) ("[T]he policy in question [must be] one of overarching importance to the public as opposed to the parties only."). Courts should "examine the strength of the policy as well as the extent to which it affects the public as a whole." *Id.* Additionally, a substantial policy is one where "the public interest is so strong and the policy so clear and weighty that we should place the policy beyond the reach of contract, thereby constituting a bar to discharge that parties cannot modify, even when freely willing and of equal bargaining power." *Id.*

Person points to two separate issues in support of his wrongful discharge claim — inappropriate resident placements and insufficient staffing. The Utah legislature has delegated responsibility for residential treatment facilities such as Youth Center to the Utah Department of Human Services and its Office of Licensing, giving the Office of Licensing the power to promulgate regulations governing the facilities.  Utah Code Ann. § 62A-3-106.

There is a general rule that such facilities should adopt policies which protect residents from harm.  *See* Utah Admin R. 501-2-6(E)(8) (facilities must have a written policy recognizing residents' right to "freedom from potential harm or acts of violence"). Youth Center's standard of separating sexual misconduct patients from its other residents, however, was a matter of internal policy not directly mandated by legislation or regulations.  While it may be a clear and substantial public policy to protect children from sexual abuse, resident separation within treatment facilities is a decision left up to the individual establishments.  Therefore, the court is not convinced that Person's complaints about placements in his unit implicates a clear public policy of the sort that may support a wrongful termination action.

The staff-resident ratios is a somewhat closer question.   The Utah Legislature ordered the Office of Licensing to establish staff to resident ratios for residential treatment facilities, Utah Code § 62A-2-106(1)(a)(i)(L), and the Office has done so, mandating that programs must maintain "a staff ratio of no less than one staff to every four consumers," Utah Admin R. R501-19-5(D)(3)(f).  On the one hand, these policies affect only a limited subset of the public, those who spend time in residential treatment facilities, but on the other hand the treatment of individuals in such facilities is generally a matter of concern to the general public.  The resident-to-staff ratio cannot be contracted around, and the state imposes penalties, including criminal

sanctions, for violations of the rule.[2] Assuming without deciding that the state-mandated ratios implicate a clear and substantial public policy, Person's claim for wrongful termination still fails as a matter of law.

First, even if staff-to-resident staffing ratios are a matter of public concern, it is not clear that Person's internal reporting of under-staffing sufficiently implicated this public policy to support a wrongful discharge action. In his complaints to management, Person never mentioned the state-mandated ratios, but merely made general statements about how his unit was chronically under-staffed. Utah courts have determined that, in some circumstances, internal reporting which "furthers a clear and substantial public policy" may constitute protected behavior. *Ryan*, 972 P.2d at 408 n.7. In requiring a causal connection between a public policy and an employee's termination, however, the third part of the wrongful discharge test is meant to measure "whether dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy." *Id.* at 404 n.4. The policy of adequately staffing residential treatment centers is not significantly furthered by internal reporting of perceived violations, made with no reference to state-mandated requirements and in a context which suggests the employee is primarily unhappy with his work load.

Second, Defendants have come forward with many reasons why Person was terminated, including his work ethic and management style. This shifts the burden to Person to prove "engaging in the protected conduct was a 'substantial factor' in the employer's motivation to

---

[2] A facility in violation of the staff-to-resident ratios may have its license denied, suspended, or revoked, and the state can restrict or prohibit new admissions to the program. Utah Code § 62A-2-112. Additionally, the owner, manager, or operator of the establishment is guilty of a class A misdemeanor if a violation of the staffing rules "endangers or harms the health, welfare, or safety of persons" under his care. Utah Code § 62A-2-116.

discharge the employee." *Id.* at 409 10. The facts, taken in the light most favorable to Person, show that his concerns about staffing and placement issues were largely ignored.[3] Scoggan has stated staffing and placement issues continued after Person's departure, and that Evans did nothing in response to Scoggan's own complaints. This alleged pattern of indifference, however, provides insufficient evidence for a jury to conclude that Person's complaints were a substantial factor in Person's termination. Indeed, the fact that Scoggan made the same complaints as Person and was not fired is compelling evidence that Person's statements about under-staffing were not a substantial reason for his own termination. Therefore, even if Person's internal reporting implicated a clear and substantial public policy, his wrongful termination claim should properly be dismissed.

## CONCLUSION

Defendants have asked for summary judgment on all three of Person's claims: retaliation under the FMLA, interference with the FMLA, and wrongful discharge under state law. For the reasons stated above, the court finds material issues of fact exist and DENIES summary judgment on Plaintiff's claims of retaliation and interference under the FMLA, but GRANTS summary judgment as to Plaintiff's wrongful discharge claim.

---

[3] At most, Evans characterized his complaints, along with Person's alleged exaggeration of hours worked and deflections of blame onto others, as evidence of a refusal to take personal responsibility for his unit.

DATED this 16th day of December, 2011.

BY THE COURT:

_____
Clark Waddoups
United States District Judge